**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

ANIL NAYEE,                                                    :
                                                              :
              Petitioner,                    :          Civ. No. 15-1288 (PGS)
                                                              :
     v.                                          :
                                                              :
STEPHEN D'ILIO, et al.,                                       :          **OPINION**
                                                              :
              Respondents.                   :
_____ :

**<u>PETER G. SHERIDAN, U.S.D.J.</u>**

## I.      INTRODUCTION

Petitioner, Anil Nayee ("Nayee" or "Petitioner"), is a state prisoner proceeding *pro se* with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the amended habeas petition is denied. A certificate of appealability shall only issue on two of Petitioner's claims.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The factual background giving rise to Petitioner's judgment of conviction in state court is taken from the New Jersey Superior Court, Appellate Division's July 5, 2007 opinion in Petitioner's initial direct appeal.

> Defendant Anil Nayee appeals from a January 28, 2005 judgment of conviction, entered following a trial by jury for murder, <u>N.J.S.A.</u> 2C:11-3a(a1), (2) (count one); possession of a weapon for an unlawful purpose, <u>N.J.S.A.</u> 2C:39-4d (count two); and possession of a prohibited weapon, <u>N.J.S.A.</u> 2C:39-5d (count three). The judge sentenced the defendant to a prison term of fifty years with an eighty-five percent parole disqualifier for count one and merged the two remaining counts into the first. . . .
>
> Defendant, an immigrant from India, came to America in 1980 to live with his grandparents. He participated in an arranged marriage that was not fulfilling, but both his parents and his wife's parents

forbade a divorce. Nonetheless, defendant began to date Ann Mendez, whom he met while they were both taking college classes at Rutgers University in Newark. Mendez attended the university part-time at night and worked during the day at a bank in Jersey City. Defendant would often pick her up at the end of her work shift, occasionally arriving up to two hours before the end of the shift and waiting for her.

After defendant and Mendez had dated for approximately six months without incident, their relationship faltered. For example, one of Mendez' coworkers noticed that she had bruises on her face, which prompted the coworker to call defendant and to tell him that if he ever hurt Mendez again, she would tell the police and would help Mendez obtain a restraining order.

In addition, in Spring, 2001, after Mendez had changed jobs, she was introduced to Mohammed Gayyoor, who was installing a new computer system at her former bank. While he was working on the project, they saw each other almost every day, and they maintained a long distance relationship when Gayyoor returned to Oklahoma at the completion of the project.

On October 11, 2001, at some point before 6:00 p.m., Mendez and defendant were seen arguing on a street corner in Newark. Mendez was attempting to get to her Account Fundamentals class, but defendant blocked her path and would not let her pass. Defendant seemed upset at Mendez and was raising his voice at her. Later, when Mendez finally made it to class, defendant watched her through the window in the door of the classroom. When class was over, around 9:00 p.m., defendant was again seen arguing with Mendez.

Gayyoor, who was familiar with Mendez' class schedule, normally received a call from Mendez during the break and at the end of her class. However, on October 11, 2001, Mendez did not call him. Gayyoor called her cell phone repeatedly, but no one answered the phone. Eventually, he received a call from her phone, but someone other than Mendez was on the line. It was a male, who identified himself as Mendez' ex-boyfriend. When Gayyoor responded that he was her current boyfriend, the caller hung up. Following this exchange, Gayyoor repeatedly called Mendez' cell phone and either no one would pick up or someone would answer and immediately hang up. Later that night, the same male who had called, answered Mendez' phone and told Gayyoor that Mendez was dead. Gayyoor then called Mendez' mother and she called the

Jersey City police department and told them her daughter was missing.

On the morning of October 12, 2001, Lieutenant David LaPoint of the Carteret Police Department received a phone call from a local attorney, Louis Kady. Kady asked LaPoint to come to the parking lot of his building on Washington Avenue. Upon his arrival, LaPoint saw defendant in the parking lot near a Mitsubishi automobile, talking on his phone. As he approached, LaPoint noticed dried blood on the defendant's hands, pants, undershirt and on his neck. Defendant handed LaPoint his phone and said, "This is my lawyer."

After he arrested defendant, LaPoint looked inside the car where he saw blood on the console and between the two seats. He opened the door, moved a blanket that was in the back seat, and discovered Mendez' body. Thereafter, defendant's clothing was seized as evidence and DNA testing revealed that Mendez' blood was on defendant's shirt and pants. Also seized was a receipt from a Rite-Aid store located on Market Street in Newark, dated October 11, 2001, which detailed the purchase of a utility knife, a screwdriver, and a hammer at 6:23 p.m. that evening. Defendant's vehicle was impounded and, in it, police found a black bag containing a screwdriver, blanket, utility knife and blade. Bloodstains on the knife were determined to be from more than one sources. Defendant was the primary contributor to those bloodstains, but Mendez could not be excluded as a partial contributor.

Dr. Geetha Ann Natarajan, the Middlesex County Medical Examiner, testified at trial that she performed the autopsy of Mendez on October 13, 2001. Her examination revealed that Mendez' hands and left arm had been sliced with a knife and that she had been stabbed in the neck. Such wounds could have been caused by the knife found in defendant's possession. Dr. Natarajan was of the opinion the stab wound to Mendez' neck would have caused her to aspirate blood into her windpipe and lungs with each breath, resulting in her death.

On October 16, 2001, defendant was taken from the jail to the emergency room of the mental health center at Robert Wood Johnson Hospital because a medical technician at the jail felt defendant needed to be hospitalized for his own protection. Based on her observations, the technician noted that defendant had impaired insight, his judgment was grossly impaired, and he claimed he was hearing and seeing God in the room. Following an examination at the hospital by Dr. Waldburg Zomorodi, defendant

was involuntarily committed for psychiatric care. Dr. Zomorodi testified at trial that his diagnosis was that defendant was suffering from depression with psychotic features. Dr. Zomorodi opined that, within a reasonable degree of psychiatric certainty, defendant was suffering from a severe mental illness on October 11, 2001, and was probably psychotic that day.

Following his involuntary commitment to the Ann Klein Forensic Center, defendant was prescribed numerous medications. He remained there, under supervision, until October 10, 2002, when was discharged to the county jail. Upon his discharge, one of his treating physicians diagnosed defendant as suffering from a major depressive disorder and noted that he should continue to receive his antipsychotic medications, antidepressants and mood stabilizers.

Several of defendant's treating physicians testified about their treatment of him while he was at Ann Klein. Also testifying on behalf of defendant was Dr. Robert Latimer, who was qualified as an expert in the area of forensic psychiatry. According to Dr. Latimer, defendant was delusional and hallucinating and he thought that someone on television was discussing him and that God was addressing him. Based no this, Dr. Latimer opined that defendant was depressed with psychotic features and that he was paranoid and heard command hallucinations.

Defendant did not testify in his own behalf at trial, but Dr. Latimer testified about what defendant told him of his relationship with Mendez. As related by defendant, they dated, were sexually intimate, and he wanted to marry her but family pressure would not allow him to divorce his current wife. On the night of the murder, defendant said he heard voices "with compelling force telling him 'kill, kill and you die, die.'" Defendant indicated he had heard such command hallucinations before, but these particular hallucinations were "extremely urgent, extremely compelling." He could not control himself and he began to cut Mendez with the utility knife. Dr. Latimer posited that, as a result of mental disease, defendant could not form the purpose to kill, but rather, he was simply obeying the voices, and that defendant's illness caused "a sudden impulsive homicidal act."

In spite of the defenses relating to defendant's mental condition, the jury returned a verdict finding him guilty of all three counts charged in the indictment.

(ECF 20 at 31-37).

The New Jersey Superior Court, Appellate Division, affirmed Petitioner's judgment and conviction on July 5, 2007. (*See id.* at 31-56). On September 20, 2007, the New Jersey Supreme Court granted Petitioner's petition for certification "limited solely to the issue of the trial court's refusal to consider the record before it in respect of defendant's mental illness as a mitigating factor under <u>N.J.S.A.</u> 2C:44-1b(4) in arriving at its sentence[.]" (ECF 20 at 57). Accordingly, the case was summarily remanded to the trial court for resentencing. (*See id*.)

On November 2, 2007, the New Jersey Superior Court sentenced Petitioner to the same fifty-year sentence. (*See* ECF 26-5 at 6). The Appellate Division affirmed this decision on October 21, 2009. (*See* ECF 20 at 59). The New Jersey Supreme Court denied certification on January 28, 2010. (*See id.* at 60).

As Petitioner was proceeding with his remanded criminal proceedings, he also attempted to bring a post-conviction relief ("PCR") petition. On July 1, 2008, Petitioner filed a PCR petition with the New Jersey Superior Court. (*See* ECF 26-10). However, on March 9, 2009, the New Jersey Superior Court denied the PCR petition without prejudice because Petitioner's direct appeal was still pending. (*See* ECF 26-11).

In December, 2009, Petitioner filed a *pro se* motion to reconsider PCR relief and requested to hold his PCR petition in abeyance with the New Jersey Superior Court. (*See* ECF 26-12; 26-13). Respondents state this motion was never addressed nor ruled upon by the Superior Court. (*See* ECF 25 at 36). However, as the Appellate Division later noted, this December, 2009 filing was determined to be a second PCR petition, which was held without action while Petitioner's petition for certification on his direct appeal was pending before the New Jersey Supreme Court. (*See* ECF 26-20 at 5 n.2). On August 11, 2011, Petitioner, now acting through counsel, filed an amended PCR petition with the New Jersey Superior Court. A

PCR hearing was held on January 19, 2012. (*See* ECF 26-16). The Superior Court issued an oral decision denying PCR on that date. (*See id.* at 28-39). It then issued a written order on January 23, 2012. (*See* ECF 26-17). The Appellate Division affirmed the PCR denial on May 28, 2014. (*See* ECF 26-20). The New Jersey Supreme Court denied certification on December 5, 2014. (*See* ECF 27-1).

Pursuant to the prisoner mailbox rule, Petitioner filed his initial federal habeas petition in in this Court on February 13, 2015. *See Houston v. Lack*, 487 U.S. 266, 270–71 (1988). Petitioner also filed a motion to stay. (*See* ECF 3). On September 9, 2015, this Court granted the stay so Petitioner could pursue further PCR proceedings in state court. (*See* ECF 10).

On August 27, 2015, the PCR Court denied Petitioner's newly filed PCR petition. It noted Petitioner's claim that the trial judge erred in conducting an ex parte interview with a juror was procedurally barred. (*See* ECF 27-11 at 3-4). Furthermore, it noted Petitioner's claim that trial and appellate counsel were ineffective in failing to raise this issue was previously adjudicated in Petitioner's prior PCR proceeding. (*See id.*). On April 4, 2017, the Appellate Division affirmed. (*See* ECF 27-14). On October 16, 2017, the New Jersey Supreme Court denied certification. (*See* ECF 27-17).

On November 17, 2017, this federal habeas matter was reopened. (*See* ECF 14). Thereafter filed an amended habeas petition on May 15, 2018. (*See* ECF 20). This Court received Respondents' response in opposition to the amended habeas petition in January, 2019. (*See* ECF 25-27). Respondents assert this amended habeas action is untimely. Additionally, Respondents claim that Petitioner's amended habeas petition lacks merit. Petitioner filed a reply brief in support of his amended habeas petition in August, 2019. (*See* ECF 40). The matter is now ripe for adjudication.

### III.    LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also*, *Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Dennis Sec'y Dep't of Corr.*, 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV.   DISCUSSION

Petitioner raises the following claims in his amended habeas petition:

1. Denial of due process and ineffective assistance of counsel when Petitioner appeared before the jury in prison garb ("Claim I").

2. Trial court's failure to apply mitigating factors to the sentence ("Claim II").

3. Trial court error in failing to instruct the jury on the lesser included offense of manslaughter ("Claim III").

4. Ineffective assistance of trial and appellate counsel regarding failure to investigate whether other jurors had overheard one juror's (E.R.) phone call ("Claim IV").

5. Improper admission of hearsay statement concerning the victim's state of mind about her fear of Petitioner ("Claim V").

6. Ineffective assistance of counsel by failing to advise petitioner of the full consequences of declining a plea offer ("Claim VI").

7. Trial court error in rejecting Petitioner's request to charge jury that they were not to concern themselves about any danger to the community that Petitioner might pose if they were to find that he was not guilty because of diminished capacity ("Claim VII").

8. Petitioner deprived right to counsel when trial judge conducted ex parte interview of juror E.R. in her chambers without Petitioner's trial counsel being present ("Claim VIII").

9. Trial, appellate and PCR ineffective assistance of counsel by failing to notice and object to trial judge's ex parte interview of juror E.R. ("Claim IX").

A. <u>Timeliness</u>

As noted *supra,* Respondents assert this habeas action is untimely. "A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). That limitations period begins to run when the criminal judgment becomes "final."[1] A state-court criminal judgment

---

[1] The statute states in full that the limitation period shall run from the latest of –

becomes "final" within the meaning of § 2244(d)(1) at the conclusion of direct review or at the expiration of time for seeking such review. *See Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000); *Morris v. Horn*, 187 F.3d 333, 337 n.1 (3d Cir. 1999); *see also* 28 U.S.C. § 2244(d)(1)(A) (the 1–year period begins on 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review'). When a defendant does not file a petition for certiorari with the United States Supreme Court, the one-year limitations period starts to run when the ninety-day period for seeking certiorari expires. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 653 (2012); *Clay v. U.S.*, 537 U.S. 522, 532 (2003); *Morris*, 187 F.3d at 337 n.1 (holding that the period of direct review "include[s] the 90–day period for filing a petition for writ of certiorari in the United States Supreme Court"); U.S. Sup. Ct. R. 13 (90–day deadline to petition for certiorari).

Petitioner's direct appeal became final on April 28, 2010. The New Jersey Supreme Court denied certification on January 28, 2010. Petitioner did not seek a writ of certiorari from

---

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence ....

28 U.S.C. § 2244(d)(1). There is no indication that any subsection other than (A) is applicable in this case.

the United States Supreme Court on his direct appeal. Thus, unless statutory and/or equitable tolling apply, Petitioner needed to file his federal habeas petition on or before April 28, 2011.

The filing of a PCR petition may statutorily toll (*i.e.*, suspend) the running of the one-year habeas limitations period. *See* 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."). A prisoner's application for state collateral review is "'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings[.]" *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85 (3d Cir. 2013) (quoting *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)).

As previously stated, on March 9, 2009, the New Jersey Superior Court denied Petitioner's initial PCR petition without prejudice because his direct appeal was still pending. Petitioner was then instructed specifically by the Office of Public Defender that he needed to refile his PCR petition <u>after</u> his direct appeal concluded. (*See* ECF 40-2 at 19 (emphasis added)).

Thereafter, Petitioner filed what he titled a motion for reconsideration in December, 2009 to hold his PCR petition in abeyance. (*See* ECF 26-12). The motion's brief though was essentially another PCR petition. (*See* ECF 26-13). However, this motion for reconsideration was untimely because it was not filed within twenty days of the March 9, 2009 order which had dismissed Petitioner's PCR petition as prematurely filed due to his pending direct appeal. *See* N.J. Ct. R. 1:7-4; 4:49-2. Construed as a motion for reconsideration, this motion does not act to statutorily toll the AEDPA one-year statute of limitations. *See Clement v. Hauck*, No. 12-5234, 2015 WL 4171839, at *5 (D.N.J. July 10, 2015). Nevertheless, it appears as if the state courts also interpreted Petitioner's December, 2009 filing as another PCR petition. Indeed, the

Appellate Division's statement in footnote 2 of its 2014 opinion appears to make this clear. (*See* ECF 26-20 at 5 n.2 ("Defendant <u>filed</u> a second petition in December, 2009, which was held without action while the petition for certification was pending in <u>Nayee</u>.II.") (emphasis added)). Furthermore, Petitioner's PCR counsel filed an *amended* PCR petition in August, 2011. If there was no *pending* PCR petition, then it would not have been necessary for counsel to file an *amended* PCR petition in August, 2011.

Accordingly, it appears Petitioner had a "properly filed" PCR petition pending from April 28, 2010 (when his judgment became final), until he filed his counseled amended PCR petition more than fifteen months later on August 11, 2011. That petition was then pending until the New Jersey Supreme Court denied certification on December 5, 2014. Thereafter, Petitioner filed his federal habeas petition in this Court in February, 2015, well within AEDPA's one-year statute of limitation. Accordingly, statutory tolling saves Petitioner's federal habeas petition.

Even if statutory tolling did not save Petitioner's federal habeas petition as described above, this would not end this Court's inquiry into timeliness. Indeed, Petitioner's federal habeas petition can still be considered timely if he is entitled to equitable tolling. "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuiglielmo*, 544 U.S. 408, 418 (2005); *see also Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 89 (3d Cir. 2013). "There are no bright lines in determining whether equitable tolling is warranted in a given case." *See Pabon v. Mahanoy*, 654 F.3d 385, 399 (3d Cir. 2011). The Third Circuit has explained that "equitable tolling is appropriate when principles of equity would make rigid application of a limitation period unfair, but that a court should be

sparing in its use of the doctrine." *Ross v. Varano*, 712 F.3d 784, 799 (3d Cir. 2013) (citing *Pabon*, 654 F.3d at 399; *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999)).

For equitable tolling to apply, the Third Circuit has required a showing of reasonable diligence:

> [t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum, extreme, or exceptional diligence, [citing *Holland v. Florida*, 130 S. Ct. 2549, 2565 (2010)]. "This obligation does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period appellant is exhausting state court remedies as well." *LaCava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005).... The fact that a petitioner is proceeding pro se does not insulate him from the 'reasonable diligence inquiry and his lack of legal knowledge or legal training does not alone justify equitable tolling. *See Brown v. Shannon*, 322 F.3d 768, 774 (3d Cir. 2003).

*Ross*, 712 F.3d at 799. Extraordinary circumstances may be found where: (1) the petitioner has been actively misled; (2) the petitioner has in some extraordinary way been prevented from asserting his rights; or (3) where the petitioner has timely asserted his rights in the wrong forum. *See Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001).

This Court is incredibly mindful that equitable tolling should be used sparingly. However, in this case, and based on this record, if statutory tolling does not save Petitioner's federal habeas petition, equitable tolling does. First, Petitioner made the requisite showing that he pursued his rights diligently. Almost immediately after the New Jersey Supreme Court denied certification on January 28, 2010, Petitioner attempted to get his PCR petition reinstated with the New Jersey Superior Court. Indeed, in early March, 2010, only one month after the New Jersey Supreme Court denied certification, Petitioner had an inmate paralegal contact the criminal division manager at the Middlesex County Courthouse to get his PCR petition reinstated. (*See* ECF 40-2 at 20-21). First, this inmate paralegal contacted the criminal division manager by

telephone. (*See* ECF 40 at 20; ECF 40-2 at 20). Next, Petitioner and the inmate paralegal wrote

to the criminal division manager on March 3, 2010. (*See id.* at 21). That letter stated as follows:

> [a]s per our conversation on the telephone, Mr. Nayee wish to
> proceed with his Post Conviction Relief petition and once your
> office has stamped his copy as "FILED" would you kindly return a
> copy of the petition to him for his receipt.

(*See id.* (emphasis added)). It also appears Petitioner wrote a letter to the judge who conduced his

trial and sentenced him at this time, the Honorable Deborah J. Venezia. While Petitioner did not

include a copy of <u>his</u> correspondence to Judge Venezia, Judge Venezia obviously received some

type of correspondence from Petitioner. Indeed, on March 4, 2010, Judge Venezia wrote to

Petitioner and stated the following, "[a]s I am no longer assigned to the Criminal Division I have

forwarded the letter received on March 2, 2010 to the Honorable Frederick P. DeVesa, Presiding

Judge Criminal Division." (*See id.* at 22).

   At this time, Petitioner also became represented by the New Jersey Office of the Public

Defender in his PCR proceedings. Indeed, Petitioner includes a copy of an April 6, 2010 letter

from the Office of the Public Defender to the same criminal division manager at the Middlesex

County Courthouse Petitioner and the inmate paralegal had previously corresponded with in

March, 2010. (*See id.* at 24). In that letter, the Assistant Public Defender ("AFD") stated it

acknowledged receipt of Petitioner's PCR petition, that the matter should proceed as a PCR and

that the Office of the Public Defender was in the process of preparing the case for attorney

assignment. (*See id.*). Thus, it appears as if even the assistant federal defender was under the

impression that Petitioner had a pending PCR petition; otherwise, he would not have stated to the

criminal division manager that the matter should "proceed."

   As the record makes clear, Petitioner was exercising reasonable diligence during the

period in question. Furthermore, based on the correspondence Petitioner includes in the record,

and one that Respondents do not dispute, he has made an adequate showing he was misled not only by the state court's criminal case manager, who, by virtue of the inmate paralegal's contemporaneous correspondence dated March 3, 2010, indicates she would be filing Petitioner's PCR petition, but also potentially by the Office of the Public Defender's April 6, 2010 letter. Therefore, this Court finds even if statutory tolling did not save Petitioner's habeas petition, then equitable tolling does. Accordingly, this Court will analyze Petitioner's federal habeas petition on the merits.

    B.  <u>Merits</u>

        i.    *Claim I*

      In Claim I, Petitioner asserts he was denied due process and counsel was ineffective when Petitioner was permitted to appear before the jury in prison garb. With respect to due process, the last reasoned decision on this claim was from the Appellate Division's July 5, 2007 opinion during Petitioner's direct appeal. That court analyzed this claim as follows:

> Defendant also contends on appeal that he was denied a fair trial because he appeared in prison garb throughout the trial. Before voir dire, the State informed the judge that defendant did not have any civilian clothing. Upon inquiry, defense counsel stated that he had no objection to defendant appearing in prison garb because the jury would, in any event, learn from the medical records that defendant was incarcerated. Consequently, counsel was not concerned about prejudice as a result of the jury's awareness of defendant's incarceration.

> We have previously declared that it is the responsibility of the judge to question criminal defendants on the record "concerning their desire to relinquish the right to appear in civilian clothing," and to accept this waiver only through "a knowing, intelligent and voluntary waiver on the record. . . ." *State v. Carrion-Collazo*, 221 N.J. Super. 103, 112 (App. Div.), *certif. denied*, 110 N.J. 171 (1988). The presumption against a defendant appearing in prison garb exists because it "'may affect a juror's judgment,' [it] 'furthers no essential state policy' and [it] 'operates usually against only those who cannot post bail prior to trial.'" *Id.* at 109 (quoting

15

*Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1619, 1693, 48 L. Ed. 2d 126, 131 (1976)).

The case law has further evolved to the extent the Supreme Court has directed that even defense witnesses should not testify in prison garb and that corrections authorities must supply incarcerated defense witnesses with civilian clothing. *State v. Artwell*, 177 N.J. 526, 534-35 (2003). Furthermore, such clothing must be of reasonable size, cleanliness and quality "as to not have the potential to diminish [defendant's] credibility before the jury." *State v. Herrera*, 385 N.J. Super. 486, 499 (App. Div. 2006). These requirements were established because "the trial court is responsible for assuring that the presumption of innocence is not lost at any stage in the proceedings because of extraneous, impermissible factors such as defendant's physical appearance." *State v. Maisonet*, 166 N.J. 9, 22 (2001).

Defendant now contends that he was denied a fair trial because his counsel allowed him to appear in prison garb and he now speculates that could have led the jury to believe that he was incarcerated because he was still dangerous. While we are concerned that the judge did not address defendant personally, did not address defendant's prison garb during voir dire, and did not provide cautionary instructions to the jury, we are convinced that defendant acquiesced in his attorney's representations to the court. More fundamentally, we do not perceive, under the facts of this case, that these actions deprived defendant of a fair trial.

First, defendant did not deny that he killed Mendez, and thus defendant's culpability was not at issue, except to the extent it might have been "excused" or negated by reason of his mental state. Second, as noted, the safeguards regarding a defendant's dress and appearance are implemented to ensure that the presumption of innocence is not lost. Since defendant conceded that he committed the homicidal act charged, the presumption of his innocence was not tainted or lost by his wardrobe. The critical issue in contention related to his state of mind, and that turned primarily on the testimony of the expert and treating mental health specialists.

The requirement that the court personally address a defendant on the record regarding the decision to wear prison garb and give a cautionary instruction to the jury serves an important function in safeguarding a defendant's presumption of innocence, especially where the defendant chooses to testify, and we agree it was error for the judge not to insist upon adherence in this instance.

> Nevertheless, because defendant did not testify and because his conduct was not at issue, the error, allowing defendant to appear in prison garb, did not, in our opinion, have the capacity to bring about a result that was unjust.

(ECF 20 at 51-54).

In *Estelle v. Williams*, 425 U.S. 501, 505 (1976), the United States Supreme Court stated a defendant could not be *compelled* to stand trial before a jury in prison garb, reasoning that to do so would impair the presumption of innocence while serving no state interest. Nevertheless, the Supreme Court continued, "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *See id.* at 512-13.

As explained *infra*, counsel did not object to Petitioner appearing in prison garb at his trial. Accordingly, pursuant to *Estelle*, Petitioner is not entitled to habeas relief on this claim because the failure to object necessarily negates any possible compulsion to establish the constitutional violation. *See United States v. Laprade*, 511 F. App'x 181, 185 (3d Cir. 2013) (finding no due process violation where no indication defendant was compelled to wear orange jumpsuit during trial and no record of defendant objecting to wearing the jumpsuit during trial); *United States v. Glenn*, Crim. No. 15-99-1, 2018 WL 4091788 (E.D. Pa. Aug. 24, 2018) (where neither government nor the court forced defendant to wear prison garb at trial and no objection by defendant was made, defendant's claim that due process violation occurred because he appeared in prison garb before the jury lacks merit).

Petitioner though also alleges counsel was ineffective in permitting him to appear in prison garb at trial. Petitioner raised this claim on direct appeal. However, the Appellate Division determined that it could not be resolved on direct appeal as it was more appropriately addressed in a PCR petition. (*See* ECF 20 at 54). It does not appear though that Petitioner subsequently

raised this claim in his PCR proceedings. Accordingly, this ineffective assistance of counsel claim is unexhausted. Nevertheless, this Court can still deny an unexhausted claim on the merits if the claim is not "colorable." *See Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (citations omitted).

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the now well-known two-prong test for demonstrating when a petitioner is entitled to federal habeas relief on an ineffective assistance of counsel claim. First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under the first prong of *Strickland*, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that

reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of *Strickland* requires a petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

Even if this Court were to assume *arguendo* that counsel's failure to object to Petitioner appearing in prison garb at trial fell below an objective standard of reasonableness, for the following reasons, Petitioner fails to show prejudice. Indeed, this Court is not persuaded that had such an objection been made, the outcome of the proceeding would have been different to a reasonable probability. The case against Petitioner was strong. There was no doubt that

Petitioner killed the victim. The only major issue at trial was whether Petitioner had the requisite state of mind to be convicted. Where the evidence against a petitioner is strong and a judge properly instructs the jury on the presumption of innonence, courts have noted a petitioner has failed to show prejudice due to counsel's failure to object. *See Carter v. United States*, 288 F. App'x 648, 650 (11th Cir. 2008). In this case, the evidence against Petitioner was strong. Whether he killed the victim was not up for debate. Furthermore, the trial judge properly instructed the jury on the presumption of innocence. (*See* ECF 25-12 at 54-55). Given these particular facts, Petitioner fails to show he was prejudiced by counsel's failure to object to his wearing prison garb at trial. Accordingly, the portion of Claim I which also raises an ineffective assistance of counsel claim is denied.

ii.   *Claim II*

In Claim II, Petitioner asserts the trial court erred by not applying significant mitigating factors which would have reduced his sentence to thirty years. Petitioner bases this argument on his medical history, most notably his mental medical history. This claim does not raise a constitutional claim. Indeed, courts have noted that a state court failing to consider mitigating factors at sentencing is not cognizable in a federal habeas proceeding because it only alleges a violation of state law. *See Gonzalez v. Johnson*, 15-7564, 2018 WL 6523441, at *7 (D.N.J. Dec. 12, 2018) (citing *Gentile v. Warren*, No. 11-6125, 2013 WL 85266, at *15 (D.N.J. Jan. 7, 2013)).

Petitioner also appears to raise an ineffective assistance of counsel claim within Claim II related to resentencing counsel, who was different than Petitioner's trial counsel. Sentencing mitigation factor four provides that a sentencing court can consider that "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense." N.J. Stat. Ann. § 2C:44-1b(4). During original sentencing, Petitioner's counsel went

through Petitioner's mental health history and diagnosis at length. (*See* ECF 25-15 at 5-8). With

respect to mitigation factor four, the New Jersey Superior Court stated as follows at Petitioner's

original sentencing:

> The Court has had the opportunity to have sat through and presided
> over the trial in this case as well as to have heard all of the
> arguments with respect to this sentencing event and it appears from
> all of the information presented that there would be no contest that
> Mr. Nayee to some degree suffers from a level of depression.
> However, I am unconvinced that the level of that condition is such
> that it rises to the level of establishing substantial grounds tending
> to excuse or justify the defendant's conduct. The jury did not
> accept the insanity nor diminished capacity defense and counsel is
> correct for the defendant when he indicates that a Court can in an
> appropriate situation consider that evidence as support for the
> finding of mitigating circumstance four.
>
> I have determined that it does not rise to the level of a mitigating
> circumstance. I have found that because notwithstanding the
> volume of experts who testified on the defendant's behalf in large
> part their reports were based upon a series or number of self-
> reported incidents which when considered together along with their
> conclusions are inconsistent with what appeared to be other known
> facts.
>
> This was a man who, throughout and prior to the commission of
> this crime, had an employment history, was employed at one point
> as an accounting clerk, another time as an administrator, he
> maintained his scholastic degree, an Associates degree, he had
> fourteen years of schooling, and there was indications that he had
> matriculated at Rutgers although that was not verified. It has been
> indicated that he had studied there. There was also no indication of
> any other bizarre or outlandish type of behavior.
>
> Based upon the consideration of all these factors I am therefore
> satisfied that he did not suffer from a mental condition that would
> have risen to the level of establishing substantial grounds to excuse
> or justify the conduct in this case and therefore I decline to find
> mitigating factor four.

(ECF 25-15 at 17-18). Ultimately, on direct appeal, the New Jersey Supreme Court granted

Petitioner's petition for certification, "limited solely to the issue of the trial court's refusal to

consider the record before it in respect to defendant's mental illness as a mitigating factor under *N.J.S.A.* 2C:44-1b(4) in arriving at its sentence." (ECF 26-4 at 1). Thus, the matter was remanded back to the Superior Court to consider *State v. Nataluk*, 720 A.2d 401, 408 (N.J. Super. Ct. App. Div. 1998) (finding that it does not follow from jury's rejection of insanity defense that defendant's mental condition could not constitute a mitigating factor at sentencing).

The resentencing hearing was conducted by the same judge who presided over Petitioner's trial and originally sentenced Petitioner. At resentencing, Petitioner had new counsel who argued as follows:

> It is my understanding, there is a question concerning the mental capacity of this defendant during the course of the trial. There were experts produced on behalf of the defendant in that regard. And, I believe, there were some indications during the course of the trial, I believe the State produced, according to the decision and the transcript, only one expert in that regard.
>
> Where there was numerous produced by the defense, as to the condition of Mr. Nayee, during the course of the subsequent events, and even maybe possibly preceding the events . . . . knowing your Honor recalls the trial, your Honor probably has trial notes.

(ECF 26-5 at 2). Ultimately, at resentencing, the Superior Court again declined to find that the proofs established mitigating factor four. (*See id.* at 5).

Petitioner claims in his petition that resentencing counsel did not review the full record and simply re-read the original transcript from the sentencing hearing. (*See* ECF 20 at 10). Petitioner rehashes his medical mental history that was elucidated at trial. Of course, this information was already part of the record and brought forth during trial, original sentencing and mentioned by resentencing counsel at the resentencing hearing. Petitioner does not come forward with any additional evidence with respect to his medical mental history that counsel should have

added at resentencing. Accordingly, for these reasons, this Court fails to see how Petitioner is entitled to federal habeas relief on this ineffective assistance of counsel claim at resentencing.

In addition to arguing resentencing counsel should have stressed more about his medical mental history at resentencing, Petitioner goes further in his reply brief by arguing that his assigned counsel "failed to investigate additional mitigating factors in support of the resentencing hearing, such as, Petitioner had completed several mental group and other programs to improve himself since his incarceration, and that he was free from any institutional infractions." (ECF 40 at 61-62).

At the outset, this Court notes that raising this issue and attempting to present additional facts in a reply brief for the first time is improper. *See McNeil v. Johnson*, No. 18-10003, 2019 WL 1650283, at \*12 (D.N.J. Apr. 17, 2019) (citing *D'Allessandro v. Bugler Tobacco Co.*, No. 05-5051, 2007 WL 130798, at \*2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)); *see also Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015)). "[T]his doctrine applies not only in standard civil suits, but is also applicable to reply briefs in habeas proceedings as '[b]asic fairness requires that an opposing party have a fair notice of his adversary's claims, as well as an opportunity to address those claims.'" *McNeil*, 2019 WL 1650283, at \*12 (quoting *Judge*, 119 F. Supp. 3d at 284 (quoting *Soto v. United States*, No. 04-2108, 2005 WL 3078177, at \*6 (D.N.J. Nov. 16, 2005)); *see also Thompson v. United States*, No. 12-1312, 2015 WL 1344793, at \*6 n.9 (D.N.J. Mar. 23, 2015)). This is especially true in a habeas case like this where Petitioner certified that he knew he needed to *include in his habeas petition* all grounds for relief and the facts that support each ground. (*See* ECF 20 at 29 (emphasis added)). This reason alone is enough to deny analyzing this claim. Nevertheless, in the interest of justice, this Court will also analyze the claim on the merits.

In claiming that counsel was ineffective for failing to investigate, a petitioner must make a comprehensive showing as to what the investigation would have produced, that the evidence would have been admissible, and how it would have changed the outcome of his proceeding to a reasonable probability. *See, e.g.*, *Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *5 (D.N.J. May 2, 2016) (citing *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)) (other citations omitted). Petitioner's conclusory statement that he completed mental health programs without any supporting documentation falls short of the comprehensive showing necessary to show prejudice in a failure to investigate ineffective assistance of counsel claim.

Additionally, this Court notes that the New Jersey Supreme Court's remand to the Superior Court for resentencing appeared limited to the issue of whether Petitioner's mental illness could be considered under mitigation factor four to show that there was substantial grounds to excuse or justify Petitioner's conduct. (*See* ECF 26-4 at 1). Thus, it is certainly questionable whether the resentencing court would have permitted evidence concerning Petitioner's positive experiences with mental health groups *post-conviction* would have fallen into a category that the Superior Court was asked to reexamine on remand.

Finally, this Court notes even if Petitioner could overcome the hurdles outlined above, he has failed to show to a reasonable probability that the outcome of his resentencing would have been different due to the other mitigating and aggravating factors considered and decided by the original and resentencing courts. Accordingly, Petitioner fails to show that he is entitled to habeas relief on this ineffective assistance of counsel claim within Claim II on the merits as well.

iii.    *Claim III*

Petitioner asserts in Claim III that the trial court erred in failing to instruct the jury on the lesser-included offense of manslaughter to the murder charge. He also asserts that trial counsel

was ineffective for arguing that there was no basis for the instruction. (*See* ECF 20 at 11-12). With respect to Petitioner's claim that the trial court erred in failing to instruct the jury on the lesser-included manslaughter charge, the Appellate Division decided this claim as follows on direct appeal:

> Regarding defendant's argument that the court erred in failing to instruct the jury that it could convict defendant of manslaughter as a lesser-included offense of murder, we recognize that "where the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest." *State v. Powell,* 84 *N.J.* 305, 319 (1980), *certif. denied,* 87 *N.J.* 332 (1981). *See also State v. O'Carroll,* 385 *N.J. Super.* 211, 224 (App. Div.), *certif. denied,* 188 *N.J.* 489 (2006); *State v. Messino,* 378 *N.J. Super.* 559, 581 (App. Div.), *certif. denied,* 185 *N.J.* 297 (2005). "[E]ven in the absence of a request, ... 'a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense.' " *State v. Thomas,* 187 *N.J.* 119, 132 (2006) (quoting *State v. Jenkins,* 178 *N.J.* 347, 361 (2004)). *See also N.J.S.A.* 2C:1-8e. "Conversely, a trial 'court ha[s] no duty to instruct the jury *sua sponte* on [an included offense charge if] the evidence [does] not clearly indicate or warrant such a charge.' " *Thomas, supra,* 187 *N.J.* at 132 (quoting *State v. Savage,* 172 *N.J.* 374, 401 (2002)) (bracketed material in original).
>
> Prior to the presentation of closing arguments in this case, the court inquired of the attorneys whether they wanted an instruction on aggravated manslaughter submitted to the jury. The prosecutor responded, "I am not specifically requesting but ... I think the court's required to charge it." Counsel for defendant took the opposite position, suggesting there was no basis in the record for a charge on lesser-included offenses. After the following exchange, the court agreed with defense counsel:
>
>> DEFENSE COUNSEL: On manslaughter, Judge, the first time the word reckless was ever mentioned in this case was just now when [the prosecutor] utilized that word. I submit it is not the State's theory. It is not the defense's theory. There has been no testimony about recklessness. There has been no evidence from where anyone could reasonably infer

that this was anything other than murder, if they find it is murder. The State did not open to the jury in anything other than murder. Did not examine any of its witnesses in such a way, nor any of its experts. Actually there is no basis in light of the mental health defense the jury was not given any guidance. The prosecutor didn't ask whether someone could act reckless to his expert nor that is a theory that the prosecutor attempted to advance. And I would submit that there is no basis in the record to charge a lesser included offense.

THE COURT: Do you have anything further on that, [Mr. Prosecutor]?

PROSECUTOR: No, Judge, I stand on my position on that.

THE COURT: I concur with [defense counsel] in that there is no rational basis in the evidence presentation that was in court[] an aggravated manslaughter charge as a lesser so I will not charge that.

Pursuant to *N.J.S.A.* 2C:11-3a, "criminal homicide constitutes murder when: (1)[t]he actor purposely causes death or serious bodily injury resulting in death; or (2)[t]he actor knowingly causes death or serious bodily injury resulting in death[.]" By comparison, "[c]riminal homicide constitutes manslaughter when ... [i]t is committed recklessly[.]" *N.J.S.A.* 2C:11-4b(1). Pursuant to *N.J.S.A.* 2C:11-4a, "[c]riminal homicide constitutes aggravated manslaughter when [ ] the actor recklessly causes death under circumstances manifesting an extreme indifference to human life[.]"

In its opinion in *State v. Jenkins,* the Supreme Court reiterated the distinctions between murder and manslaughter as follows:

Thus, the following key distinctions emerge. To be guilty of SBI [serious bodily injury] murder, the defendant must have knowingly or purposely inflicted serious bodily injury with *actual knowledge* that the injury created a substantial risk of death and that it was "*highly* probable" that death would result. In aggravated manslaughter, by contrast, the defendant must have caused death with an "awareness and conscious *disregard* of the *probability* of death." If, instead, the defendant

> *disregarded* only a "*possibility*" of death, the result
> is reckless manslaughter.
>
> [*Jenkins, supra,* 178 *N.J.* at 363 (emphasis in
> original) (citations omitted).]

At trial, defendant did not deny the homicidal act, that is, that he
inflicted injuries that caused the death of Ann Mendez. Instead,
defendant advanced alternative defenses of insanity, *N.J.S.A.* 2C:4-
1, and diminished capacity, *N.J.S.A.* 2C:4-2, stating that due to a
mental disease defect, his conduct should be excused or that it
negated the intent required for murder.

Respecting the insanity defense, *N.J.S.A.* 2C:4-1 provides:

> A person is not criminally responsible for conduct if
> at the time of such conduct he was laboring under
> such a defect of reason, from disease of the mind as
> not to know the nature and quality of the act he was
> doing, or if he did know it, that he did not know
> what he was doing was wrong. Insanity is an
> affirmative defense which must be proved by a
> preponderance of the evidence.

Diminished capacity, which is addressed in *N.J.S.A.* 2C:4-2,
provides:

> Evidence that the defendant suffered from a mental
> disease or defect is admissible whenever it is
> relevant to prove that the defendant did not have a
> state of mind which is an element of the offense. In
> the absence of such evidence, it may be presumed
> that the defendant had no mental disease or defect
> which would negate a state of mind which is an
> element of the offense.

The Supreme Court observed in *State v. Delibero,* 149 *N.J.* 90, 92-
93 (1997), "Diminished capacity describes a disease or defect of
mind that may negate the mental state that is an element of the
offense charged. The insanity defense exculpates an actor from
guilt for conduct that would otherwise be criminal."

Thus, the proofs would have allowed the jury to find either that
defendant acted out of jealousy, as the State urged, or that he
obeyed the voices in his head, and as Dr. Latimer testified, his was
a "sudden impulsive homicidal act." If the jurors rejected the

validity of the mental defense, they could find he acted purposely or knowingly; it was murder. If, however, they found defendant had a mental disease or defect that prevented him from acting purposely or knowingly, they could conclude either that (a) the State failed to prove that defendant could understand it was wrong to kill Mendez-he was not guilty by reason of insanity-or (b) it failed to prove defendant could form the requisite state of mind for murder. There was, however, no evidence in the record that defendant's act was committed recklessly or in the heat of provocation or passion. *N.J.S.A.* 2C:11-4b(1) and (2).

Defendant, through counsel, specifically requested that the charge on aggravated manslaughter not be given, and while "no defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense," *O'Carroll, supra,* 385 *N.J.Super.* at 224, a charge on a lesser-included offense must be given only if the evidence clearly supports it. In other words, the facts must "clearly indicate a jury could convict on the lesser while acquitting on the greater offense." *Thomas, supra,* 187 *N.J.* at 132 (citation and internal quotation omitted). That was not shown in this instance.

*State v. Jenkins* is factually distinguishable. There, the defendant "bashed" the victim in the head with a brick causing him to fall down a flight of stairs headfirst to the pavement below. *Jenkins, supra,* 178 *N.J.* at 355. According to autopsy evidence, the blow from the brick likely caused the victim to lose consciousness, but he ultimately died from the skull and brain injuries resulting from his fall to the pavement. *Id.* at 354. At trial, "defendant argued against instructing the jury on lesser-included offenses pertaining to homicide, preferring to gamble with an all-or-nothing approach on the murder charge." *Id .* at 356. As here, the State argued the lesser-included offenses should have been charged. *Ibid.* Following his conviction for murder, defendant argued that, notwithstanding his request at trial, the court erred in failing to instruct on the lesser-included offenses of reckless manslaughter and aggravated manslaughter. *Id.* at 357.

In its review, the Supreme Court first rejected the notion that defendant's reversal of position was precluded by the doctrine of invited error or judicial estoppel, reasoning instead that the trial court had independently arrived at its decision not to instruct on the lesser-included offenses. *Jenkins, supra,* 178 *N.J.* at 360-61. In other words, the trial court had acceded to defendant's request, without having been manipulated or misled into error. The trial court had recognized defendant's tactical reasons for requesting an

all-or-nothing charge, but it had made its decision on the basis of its belief that "there [was] no way that the jury could find reasonably that the striking of this person was done in anything other than purposeful, knowing, intentional manner." *Id* . at 360. The Court concluded, however, that the trial court's limited focus on the purposeful, knowing and intentional nature of defendant's striking of the victim was error:

> Instead, the proper inquiry in distinguishing murder from the two degrees of manslaughter relates to defendant's state of mind as to the risk of death. A jury could have concluded that defendant struck Thomas in order to kill him or with knowledge that death was certain or highly probable. However, the facts indicate that the jurors also could have rationally concluded that defendant struck the victim not knowing that serious bodily injury would result in the victim's death, or not knowing that the injury created a substantial risk of death and that it was highly probable that death would result. That is, the jurors could have found that defendant consciously disregarded a known risk that created the possibility or probability that death would follow from his conduct.

> [*Id.* at 363-64.]

In this case, the trial court focused upon the effect of defendant's ability to appreciate the nature of his conduct or to form the necessary intent for the crime charges.

Also, in *O'Carroll,* we reversed defendant's conviction of first degree murder, and remanded the matter for a new trial, concluding that it was plain error for the court to omit instructions that would have allowed the jury to consider the lesser-included offenses of aggravated and reckless manslaughter, as well as the justification of self-defense. *O'Carroll, supra,* 385 *N.J.Super.* at 217. In that case, defense counsel had requested that the court instruct the jury only on murder and passion/provocation manslaughter, but had acknowledged that "a jury could find that the time period between [the victim's] loss of consciousness and irreversible death involve[d] a conscious disregard of a substantial and unjustified risk that death could have either possibly resulted or probably resulted." *Id.* at 225. There, a factual basis for the charge of manslaughter was apparent, and defendant contended on appeal that, in the statement he gave to the police, he had said he

and the victim had been involved in a violent struggle in which the defendant thought the victim was about to stab him. Defendant also contended on appeal that he accidentally wrapped a telephone cord tight around the victim's neck as he attempted to make her drop the knife. *Id.* at 229. Thus, a jury could have concluded the defendant in *Carroll* began choking the victim only to prevent her from stabbing him and without intending the pressure he applied to her neck or the length of time he applied that pressure would result in her death. *Id.* at 229-30.

By contrast, in the context of the defense strategy in this case, defendant contends he killed Mendez out of obedience to the commanding voices. He was not acting out of self-protection and did not contend that her death was not the intended or expected result of his act. He conceded he caused the death of Mendez, but argued that he was not capable of murder because of his mental disease or defect. Because the record is devoid of the details of the killing, we cannot conceive that a jury could rationally acquit defendant of the murder charge but find him guilty of aggravated manslaughter. Reviewing the ruling under the plain error standard, whereby it will not be overturned unless it is "clearly capable of producing an unjust result," *R.* 2:10-2, we find no basis to disturb the trial court's decision not to include an aggravated manslaughter charge.

*State v. Nayee*, No. A-5060-04T4, 2007 WL 1931336, at *4–7 (N.J. Super. Ct. App. Div. July 5, 2007), *certif. granted, cause remanded on other grounds*, 932 A.2d 27 (N.J. 2007).

Petitioner is not entitled to federal habeas relief on his claim. First, as noted by the Appellate Division, Petitioner's counsel expressly stated that he did not want the trial court to charge the jury on manslaughter. Furthermore, the United States Supreme Court has never recognized that an individual has a due process right to jury instructions on lesser-included offenses in non-capital cases. *See, e.g.*, *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("Outside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error"); *Geschwendt v. Ryan*, 967 F.2d 877, 884 n.13 (3d Cir. 1992) (observing that the Supreme Court, in *Schad v. Arizona*, 501 U.S. 624 (1991), cast doubt on the theory that due process always requires the court to instruct on a lesser-included offense in non-

capital offenses by applying a harmless-error standard; conviction of an offense higher up on the ladder, is a reliable indicator that a jury would not have convicted of the least included offense that was not charged); *cf. Beck v. Alabama*, 447 U.S. 625, 627 (1980) (holding it unconstitutional to impose a sentence of *death* "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense"). Because this is a non-capital case, the denial of this claim by the state court was not contrary to or an unreasonable application of *clearly established* federal law.

Petitioner is also not entitled to federal habeas relief on his claim that his trial counsel was ineffective for failing to request the lesser-included manslaughter charge. Petitioner raised this claim on direct appeal, but the Appellate Division determined that it was more appropriately raised in PCR proceedings. (*See* ECF 20 at 49). It does not appear though that Petitioner subsequently raised this claim during the PCR proceedings. Accordingly, this Court will consider this claim on the merits to determine whether it is "colorable."

To show prejudice, Petitioner would have to show that there is a reasonable probability that the jury would have convicted him of manslaughter and not of murder had counsel made the request. *See Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011). Under New Jersey law:

> Criminal homicide constitutes manslaughter when:
>
> > (1) It is committed recklessly; or
> > (2) A homicide which would otherwise be murder
> > under N.J.S. 2C11-3 in the heat of passion resulting
> > from a reasonable provocation.

N.J. Stat. Ann. § 2C:11-4b. Here, as noted by the Appellate Division, there was no reasonable evidence produced at trial that Petitioner acted in a reckless manner. Accordingly, he fails to show the requisite level of prejudice to be entitled to relief on this ineffective assistance of counsel claim. *See, e.g., Jackson v. Britton*, No. 08-4203, 2010 WL 1337730, at *7 (E.D. Pa.

Apr. 6, 2010) (even if trial counsel had not requested involuntary manslaughter charge, ineffective assistance of counsel claim would fail since trial evidence did not reasonably support verdict for involuntary manslaughter). Thus, Claim III is denied.

    iv.    *Claim IV*

In Claim IV, Petitioner raises an ineffective assistance of counsel claim against both trial and appellate counsel. This claim relates to issues concerning juror #14, E.R. The Appellate Division during Petitioner's PCR proceedings outlined the underlying facts surrounding the claims related to juror E.R. as follows:

> Jury selection was conducted on Wednesday, September 15, 2004. The court explained to prospective jurors that defendant was charged with murder. The court questioned all prospective jurors regarding their opinions about the insanity defense, mental health, and psychiatry. Multiple times during jury selection, the judge advised prospective jurors not to discuss the case among themselves or with others.

> Jury selection continued until the late afternoon. Defense counsel had exercised twelve peremptory challenges. The last juror seated was E.R. He provided brief biographical information, and stated he had no positive answers to the multiple questions designed to detect bias, an inability to be fair and impartial, or strong attitudes about mental illness and the insanity defense. Both sides declared the jury was satisfactory. Following a brief recess, the jury was sworn and the judge delivered the standard instructions. The jury was then released until the following Tuesday afternoon.

> Sometime before the resumption of trial, the trial judge received a telephone call from a member of the full array, Ms. G., who was not selected as a juror. Ms. G. reportedly told the judge that she overheard E.R. speaking on his cellphone on the previous Wednesday. According to Ms. G., as the judge restated on the record, E.R. said "to the effect of if the prosecution does what it's supposed to do, then it's a slam-dunk case." The court did not speak to Ms. G. on the record or in the presence of counsel. So, Ms. G.'s precise statement and when it was received was not preserved. The judge apparently informed counsel of her conversation with Ms. G., although she apparently did so off the

record as well. The judge then interviewed E.R., again without counsel present, but on the record.

E.R. admitted that he discussed the case with another person on the previous Wednesday, but denied he made the statement as Ms. G. described. He claimed he said, "[I]f the prosecution proofs [sic] its case then ... you know, he'll be found guilty. I said it's up to the prosecution to prove it and the defense to disprove it. That's what a jury trial is." E.R. claimed he made the call outside the courthouse during the middle part of the afternoon—which would have been before the jury was sworn. E.R. insisted that he had not reached any conclusions about the case. The judge did not ask E.R. if he spoke to the other jurors about his views. Nor did the judge inquire whether he observed other prospective jurors nearby when he had the overheard conversation. The judge segregated him from the other jurors and directed him not to speak to them in the future.

The judge then brought the attorneys into chambers. Defense counsel requested that E.R. be excused (defense counsel apparently was previously informed, off-the-record, of Ms. G.'s allegations). The prosecutor asked for a summary of what E.R. said in his interview with the judge. The court then asked the reporter to read back E.R.'s statement. We quote the colloquy in full:

> THE COURT: [E.R.], please have a seat. I needed to bring you in here because I got a report last week. We adjourned last Wednesday and apparently an individual who is not on the panel selected as the jury in this case but was in the general audience had occasion to overhear a conversation that you had on a cell phone downstairs I guess before—either before you came up and got sworn in or before you left for the day, and I don't know if you recall the contents of that phone call—
> JUROR [E.R.]: No.
> THE COURT:—or making a phone call, but I will tell you that she claims she overheard you indicate something to the effect of if the prosecution does what it's supposed to do, then it's a slam-dunk case. Is that possibly something that you could have said?
> JUROR [E.R.]: No. What I would have said and what I believe I said, if the prosecution proves its case—
> THE COURT: If the prosecution—

JUROR [E.R.]: Yeah. If the prosecution proofs [sic] its case then—

THE COURT: Okay.

JUROR [E.R.]:—you know, he'll be found guilty. I said it's up to the prosecution to prove it and the defense to disprove it. That's what a jury trial is.

THE COURT: Do you recall where you were specifically within the jury assembly area when you made the phone call?

JUROR [E.R.]: I wasn't in the building. It was outside of the building.

THE COURT: Okay. It was outside of the building?

JUROR [E.R.]: It was outside of the building.

THE COURT: And was it after we had recessed for the day, you were on your way home, or was it during the recess after you went downstairs?

JUROR [E.R.]: I do not remember. I don't believe it was—if it was the end of the day. What time was the recess? That will—

THE COURT: Late afternoon, but I don't recall.

JUROR [E.R.]: After three?

THE COURT: It was probably around three.

JUROR [E.R.]: No. Then it wasn't the latter part. It was during the middle part.

THE COURT: Okay. Have you in your own mind reached any conclusions, come to any judgments with respect to this case whatsoever one way or the other?

JUROR [E.R.]: No. It's strictly a matter—as a matter of fact, I had a discussion about serving on the jury with my family and I explained to them inasmuch as I might have a personal reason where I don't want to because of a job that's irrelevant. There are people overseas who are being killed to protect our way of life. The least I could do is do this which is part of what I'm supposed to do as a citizen.

Any comment that I made was either misinterpreted, might have been. I understand your feelings, you have to—the law is the law as you had stated, but, as far as I'm concerned, I find the whole process fascinating. It's something that I always wanted to do, never quite had the ability in terms of financial or any otherwise to be able to do this. It's very simple.

34

THE COURT: All right. I'm going to ask you,
number one, not to speak about this in-chambers
conference with anyone at this point—
JUROR [E.R.]: Absolutely not.
THE COURT:—and I'm going to ask you—I'm
going to have you put in another room because I
have to discuss the matter with the attorneys, but
I'm going to ask you to just stay in that room and
we'll be back to you shortly.
Okay. Thank you.
JUROR [E.R.]: Which room?
THE COURT: The sheriff's officer will direct you.
Thanks [E.R.].
JUROR [E.R.]: You're very welcome.

The judge declined to find whether or not E.R.'s
telephone conversation was credible. Over the State's objection,
the court decided to excuse E.R. "[I]n the interest of making sure
that we do have a panel that has not come to any conclusions,
drawn any inferences under the circumstances, I am going to
dismiss the juror for cause...." Defense counsel did not request a
voir dire of the remaining jurors.

The judge and counsel returned to the courtroom, and the judge
advised the panel that "[w]e will be proceeding with a jury panel of
13, ladies and gentlemen." Counsel then gave opening statements,
and the trial proceeded.

*State v. Nayee*, No. A-4559-11T2, 2014 WL 2197863, at *2–4 (N.J. Super. Ct. App. Div. May

28, 2014).

In his habeas petition, and specifically within Claim IV, Petitioner claims that trial

counsel was ineffective by failing to further investigate or inquire whether any other jurors were

present when E.R.'s phone conversation took place. (*See* ECF 20 at 14). Trial counsel was

purportedly also ineffective by failing to voir dire each individual juror on the issue. (*See id.*)

The Appellate Division analyzed this claim during Petitioner's PCR proceedings as follows:

We are guided by fundamental principles regarding juror
misconduct. "A defendant's right to be tried before an impartial
jury is one of the most basic guarantees of a fair trial." *Loftin,
supra,* 191 *N.J.* at 187. "The Sixth Amendment of the United

States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants 'the right to ... trial by an impartial jury.' " *R.D., supra,* 169 *N.J.* at 557 (quoting *U.S. Const.* amends VI, XIV; *N.J. Const.* art. I, ¶ 10). "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." *Ibid.*

The court has an independent duty to determine whether a juror or jurors have been tainted, to remove tainted jurors, and then determine whether the trial may proceed with the remaining jurors, or a mistrial is warranted. *Id.* at 558–61. *R.D.* addressed taint resulting from extraneous information, calling into question a defendant's right to be judged based on evidence received in open court and not from outside sources. *Id.* at 557 (citing *State v. Bey,* 112 *N.J.* 45, 75 (1988)). The juror in that case was a nurse who had treated the alleged victim's grandmother, had "overheard things," and formed an opinion about the case. *Id.* at 555–56. *Bey, supra,* involved detailed and prejudicial newspaper articles about the defendant, and his prior convictions. 112 *N.J.* at 56, 79–81.

In *State v. Wormley,* 305 *N.J. Super.* 57, 68 (App. Div.1997), *certif. denied,* 154 *N.J.* 607 (1998), a juror disclosed in the middle of the first day of trial that she was familiar with witnesses and had gained knowledge of facts relevant to the trial. The juror denied she shared her knowledge with others, and the court excused her. *Id.* at 69. Nonetheless, we found plain error because the court did not voir dire the remaining jurors. *Ibid.* Under those circumstances, we concluded "there was a strong likelihood that, even indirectly or unintentionally," the juror may have conveyed her knowledge to other jurors. *Id.* at 70.

However, taint may result, as alleged here, from a juror's biases or preconceptions that deny a defendant his right to an impartial jury. "So important is the quality of impartiality in the trial of criminal prosecutions that jurors who have formed an opinion as to the guilt or innocence of the defendant must be excused." *State v. Williams,* 93 *N.J.* 39, 61 (1983). Racial prejudice is particularly troublesome. "[A]n allegation that a juror is racially biased strikes at the very heart of the defendant's right to a trial by an impartial jury." *State v. Phillips,* 322 *N.J. Super.* 429, 442 (App. Div.1999). If a biased juror conveys his or her views to fellow jurors, that extraneous information may undermine the other jurors' impartiality. *See State v. Tyler,* 176 *N.J.* 171, 176–77, 183 (2003) (allowing juror who expressed racial bias to remain on the jury for a day as a sanction before being excused created a presumption of prejudice).

Upon receiving evidence that a juror may be tainted—by extraneous information or intrinsic bias—the court is obliged to inquire, initially of the allegedly tainted juror, to determine if that juror or other jurors have been tainted. *R.D., supra,* 169 *N.J.* at 558. Whether the trial court's inquiry requires questioning of the entire jury panel is left to the trial court's sound discretion. The Court expressly rejected a per se rule that required inquiry of all remaining jurors. *Id.* at 561. "Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional *voir dire* is necessary to assure that impermissible tainting of the other jurors did not occur." *Ibid.*

A court may decide that inquiring of other jurors could cause harm, by conveying inappropriate information. *Ibid.* The broader inquiry also depends on a finding that "there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of [the] jury." *Bey, supra,* 112 *N.J.* at 86. Generally, any questioning of the jury panel should be conducted individually, and in camera, to assure frank and uninhibited responses, and to avoid spreading taint from one juror to the others. *Id.* at 86–89.

Whether a new trial is compelled is also a discretionary decision.

> A new trial, however, is not necessary in every instance where it appears an individual juror has been exposed to outside influence. *See Smith v. Phillips,* 455 *U.S.* 209, 217, 102 *S. Ct.* 940, 946, 71 *L. Ed. 2d* 78, 86 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.... [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."). Ultimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.

[*R.D., supra,* 169 *N.J.* at 559.]

The new trial decision requires a showing not of actual prejudice, but the capacity of the irregular matter to influence the result of the trial. *Id.* at 558 (citing *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61 (1951)).

With these principles in mind, we turn to the PCR court's review of the trial court's inquiry. We part company with the PCR court's characterization of E.R.'s comments. Particularly given the sparseness of the record (resulting from the trial judge's limited questioning), and the trial judge's failure to make credibility findings, the PCR court had no basis to credit E.R.'s version of what he said, as opposed to what Ms. G. claimed. In our view, E.R.'s reference, as reported by Ms. G., to what the prosecution "is supposed to do," displayed a potential bias in favor of the prosecution. E.R.'s view that the case could be a "slam-dunk," reflected a pre-conception about the likely nature and complexity of the case, if not about defendant's guilt.

Even if E.R.'s statement were as he claimed, he expressed a serious misunderstanding of the law. Stating "it's up to the prosecution to prove it and the defense to disprove it," he erroneously attributed a burden to defendant. Moreover, by discussing the case with another person in the midst of jury selection, E.R. clearly violated the trial judge's repeated admonition not to do so.

"[A]ll doubts about a juror's integrity or ability to be fair should be resolved in favor of removing the juror from the panel." *See Loftin, supra,* 191 *N.J.* at 187. The trial court did not affirmatively find that E.R. was telling the truth about what he said. The court also did not correct the juror regarding the burden, and find that the juror was capable of following the law on that point. Given the state of the record, it was appropriate to excuse E.R.

The PCR court emphasized that there was no evidence that E.R. shared his opinions with any of the sworn jurors. However, there also was no evidence that E.R. did not. The record is unclear because the trial judge did not ask E.R. whether he had done so. There is no evidence the judge asked Ms. G. if other members of the jury array were nearby; and the judge did not ask the impanelled jurors themselves whether E.R. spoke to them, or if they overheard him.

Although the trial judge's inquiry should have been more probing, and a voir dire of the whole panel would have been preferred, we

are not satisfied that voir dire of the entire panel was required, nor that a new trial would have been warranted in the absence of such an inquiry. We reach that conclusion based on the nature of E.R.'s remarks, and the court's swift action in removing E.R.

Even assuming E.R.'s remarks were as Ms. G. reported, they did not have the toxicity of racially biased comments, as in *Loftin, Tyler,* or *Phillips.* In *Loftin, supra,* a juror expressed bias against African–Americans in a case involving an African–American defendant, and expressed a premature conclusion, after four days of trial, that defendant was guilty. 191 *N.J.* at 183–84. The juror was quoted as saying he was going to buy a rope with which to hang the defendant. *Id.* at 184. Nor did E.R .'s remarks reflect knowledge of extraneous information or facts, such as those imparted by newspaper reports or other outside sources, as in *Bey,* or by the personal knowledge of a juror, as in *R.D.* We recognize that it may be difficult for jurors to ignore such information, once imparted.

The risks of taint were also reduced by the trial judge's swift decision to remove E.R. and direct him to have no further contact with other jurors. That fact also distinguishes this case from those in which a biased juror remains on the panel, presenting a greater risk of infecting the jury. *Cf. Loftin, supra,* 191 *N.J.* at 185 (juror remained on the panel for duration of the trial before being designated an alternate); *Tyler, supra,* 176 *N.J.* at 179 (juror made to remain on the panel for a day as punishment); *Wormley, supra,* 305 *N.J. Super.* at 68 (juror remained on the panel through openings and the testimony of the first witness).

We recognize that E.R. expressed a potential bias in favor of the prosecution—referring to what the prosecutor was "supposed to do"—and a premature assessment of how simple and easy the case would be—a possible "slam-dunk." However, even if overheard, we do not view these remarks as bearing the potential to taint the impanelled jurors. Those jurors had already been thoroughly questioned. Counsel and the court were satisfied they were capable of being fair and impartial.

In many respects, E.R.'s comments were not unlike those expressed during voir dire by other jurors who were excused for cause. Not every remark in open court, which may prompt an individual juror to be excused, presumptively taints the remaining jurors who overhear it, requiring questioning and other remedial measures. *R.D., supra,* 169 *N.J.* at 559. A prospective juror may say in open court that he is likely to believe police officers more

than others; or a juror may express the view that a defendant is likely to have done something illegal because he was indicted. Moreover, just because a judge may call a juror to sidebar to continue a discussion of the juror's experiences or view, does not preclude the possibility that the juror shared those views or experiences with a fellow member of the array. Our case law does not require immediate questioning to determine if the mere mention of those views has tainted the others. We presume, based upon the jurors' own responses to questioning, and the court's general instructions, that the remaining jurors are unaffected.

In this case, the jury received the model instruction after the jury was sworn, which occurred at the end of the day Wednesday, after E.R.'s overheard remarks. The court repeatedly instructed the jurors to make their determination of the facts "based solely upon the evidence submitted during the course of the trial." The judge also admonished the jury not to discuss the case with others, and instructed that it would be improper "for any outside influence to intrude upon your thinking." The court directed the jurors to keep an open mind until the end of the trial, to refrain from deliberating until then, and to exercise their duties "calmly and without bias, passion, prejudice or sympathy." These instructions were sufficient to overcome any reasonable possibility of taint from E.R.'s remarks, even if as Ms. G. described, and even if overheard by one or more impanelled jurors. We presume the jury followed the trial court's instructions. *State v. Burris,* 145 *N.J.* 509, 531 (1996).

As we conclude that the court was not obliged under the circumstances to voir dire the jury, we reject defendant's argument that defense counsel was ineffective in failing to request it. *See State v. O'Neal,* 190 *N.J.* 601, 619 (2007) (stating that "[i]t is not ineffective assistance of counsel ... not to file a meritless motion"); *State v. Chew,* 179 *N.J.* 186, 215 (2004) (rejecting ineffective assistance claim where evidence did not support unrequested jury instruction).

*Nayee*, 2014 WL 2197863, at *5–9.

This Court construes Plaintiff's claims within Claim IV as two-fold; namely, first, his trial counsel should have investigated whether any other jurors overheard E.R's phone conversation; and, second, trial counsel should have requested the trial judge voir dire the jurors selected if they had overheard E.R.'s phone conversation.

Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

In this case, as noted by the Appellate Division, there was nothing to indicate one way or the other whether any other impaneled jurors overheard E.R.'s purported phone conversation. Thus, Petitioner fails to show prejudice as to counsel's purported failure to investigate because he has come forward with nothing to indicate what further investigation by counsel into what impaneled jurors would have heard to possible cause taint.

Petitioner's argument that counsel should have asked the trial judge to voir dire the entire jury regarding any possible taint due to possibly hearing E.R.'s phone call suffers a similar fate as Petitioner's failure to investigate. Indeed, Petitioner has not come forward with anything to

indicate what any potential voir dire of the impaneled jury would have discovered. Thus, he cannot show that counsel's purported ineffectiveness in failing to make such a request would have changed the outcome of his proceedings to a reasonable probability because of the absence of any record that any juror was purportedly tainted. Accordingly, Petitioner is not entitled to habeas relief on Claim IV.

      v.     *Claim V*

In Claim V, Petitioner asserts that the prosecution, over his objections, was permitted to introduce inadmissible hearsay statements concerning the victim's state of mind about her fear of Petitioner. Petitioner raised this issue during his PCR proceedings. (*See* ECF 26-20 at 6 n.3) It was denied without discussion as lacking merit. (*See id.* at 26). This summary denial is entitled to AEDPA deference. *See Harrington*, 562 U.S. at 99. Within his federal habeas petition, Petitioner further claims that appellate counsel was ineffective for failing to raise this issue on direct appeal. It does not necessarily appear that Petitioner raised this issue of appellate counsel's ineffectiveness to raise this issue on direct appeal in his PCR proceedings. Nevertheless, this Court can still deny this part of Claim V if it is determined to not be "colorable."

Prior to the victim's mother testifying at trial, Petitioner's counsel sought to have the trial court preemptively instruct the jury. Most notably, counsel asserted concerns about possible hearsay statements some witnesses would make. (*See* ECF 25-7 at 2-3). However, the trial court permitted the government to call its witnesses without giving any preemptive instruction. (*See id.*) Thereafter, the victim's mother testified first that the victim was "scared" of Petitioner. (*See id.* at 8). Later, the victim's mother testified her daughter told her she was "worried about all of this." (*See id.*). After this second reference to the victim's statements to her mother, Petitioner's counsel requested a side-bar conference which was granted. (*See id.*) At the side-bar conference,

the trial judge instructed the prosecutor to tell the witness to not tell the jury what the victim had said. (*See id.* at 9). Thereafter, the sidebar concluded and the prosecutor told the victim's mother she could not testify as to things her daughter, the victim said to her. (*See id.*)

This claim is not cognizable on federal habeas review to the extent petitioner asserts that the state court's evidentiary ruling violated state law. *See Estelle,* 502 U.S. at 67–68 (stating that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions"). The due process inquiry that is applicable to this claim is whether the state court's ruling was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma,* 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir. 2001) (noting that to show that an evidentiary error rises to the level of a due process violation, a petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of the entire trial"). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352 (1990).

Under the applicable harmless error test, a habeas petitioner must demonstrate constitutional error that resulted in "actual prejudice" in order to obtain relief from a federal court; which asks whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Eley v. Erickson,* 712 F.3d 837 (3d Cir.2013) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Indeed, the Supreme Court has stated that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht, supra,* whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set

forth in *Chapman [v. California]*, 386 U.S. 18 [1967]." *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *see also Bond*, 539 F.3d at 275–76 (*"Fry* instructs use to perform our own harmless error analysis under *Brecht* ... rather than review the state court's harmless error analysis under the AEDPA standard.") In reviewing the record, if a federal habeas court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, then the error was not harmless. *See Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011) (citing *O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

The state court's denial of this claim was not an unreasonable application of clearly established federal law. This case did not involve whether Petitioner killed the victim. Instead, it involved Petitioner's state of mind at the time of the killing. Thus, whether the victim stated she was "scared" or "worried" about Petitioner to her mother prior to being killed would have had little to no impact to render the trial fundamentally unfair because the actual act of Petitioner killing the victim was not at issue. Accordingly, these two statements by the victim being introduced at trial through the victim's mother's testimony did not render the trial fundamental unfair. Any purported error in permitting the mother to testify regarding two of her daughter's statements to her about what she thought of Petitioner was harmless as the statements did not have a substantial or injurious effect in determining the jury's verdict based on the issues presented at trial.

Within Claim V, Petitioner also claims appellate counsel was ineffective in not raising this hearsay issue on direct appeal. "claims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)). In this case, Petitioner fails to show to a reasonable probability the outcome of his appeal would have been

different had appellate counsel raised this issue. Indeed, while the mother's two instances of testifying regarding her daughter's statements regarding Petitioner may have been hearsay, there really no doubt Petitioner was the actual perpetrator of the killing. This Court fails to see how raising this issue would have caused the Appellate Division to reverse Petitioner's convictions to a reasonable probability. Accordingly, for these reasons, Petitioner is not entitled to federal habeas relief on Claim V.

      vi.    *Claim VI*

In Claim VI, Petitioner alleges that trial counsel rendered ineffective assistance by failing to advise him of the full consequences of declining a plea offer. (*See* ECF 20 at 17-18). Petitioner states that prior to trial, counsel never mentioned any plea offers made by the state. There was also no disclosure as to the maximum amount of sentence he would face if he was to be found guilty according to Petitioner. (*See id.* at 17).

On appeal during his PCR proceedings, the Appellate Division noted PCR counsel argued Petitioner's trial counsel failed to advise him of the consequences of rejecting a plea offer. *See Nayee*, 2014 WL 2197863, at *2 n.4. The Appellate Division further noted though Petitioner was arguing that trial counsel failed to notify him of the plea offer altogether. *See id.* The Appellate Division decided this claim as follows:

> We turn briefly to address an argument presented in defendant's pro se brief. Defendant apparently contends that his trial attorney was ineffective because he did not inform him of a plea offer under which, in return for a plea of guilty to murder, he would have received a thirty-year sentence, with a thirty-year period of parole ineligibility. We need not decide this claim as it was not raised in defendant's petition before the trial court. *See Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234 (1973) (noting generally that appellate courts will decline to hear issues "not properly presented to the trial court" unless the questions on appeal address the trial court's jurisdiction, or concern matters of great public interest).

> In any event, defendant does not clearly assert that he would have
> accepted such a plea offer had he known about it before trial.
> Therefore, we discern no showing of prejudice from any alleged
> ineffectiveness in conveying the offer. Moreover, acceptance of a
> plea offer would have required defendant to waive the insanity
> defense, and acknowledge that he had the state of mind to commit
> murder. However, in his sworn statements in support of PCR,
> defendant asserted he did not "fully understand what happened on
> the evening Ann Mendez died, although I did understand that I was
> the person who killed her." A defendant may not secure PCR based
> on a claim he would have accepted a plea offer, where the
> defendant's factual basis would entail perjury. *State v. Taccetta,*
> 200 *N.J.* 183, 194–96 (2009).

*Nayee*, 2014 WL 2197863, at *9.

Petitioner's Sixth Amendment right to counsel extends to the plea-bargaining process.

*See Lafler v. Cooper*, 566 U.S. 156, 162 (2012). "When addressing a guilty plea, counsel is

required to give a defendant enough information "'to make a reasonably informed decision

whether to accept a plea offer.'"" *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015) (quoting

*Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43

(3d Cir. 1992))). Potential sentencing exposure is an important factor in a defendant's decision-

making process. *See id.* Indeed, as noted by the Third Circuit, "[k]nowledge of the comparative

exposure between standing trial and accepting a plea offer will often be crucial to the decision

whether to plead guilty." *Day*, 969 F.2d at 43. "A defendant who rejects a guilty plea and

receives a more severe sentence after trial makes a claim of ineffective assistance when 'he

alleges that the advice he received was so incorrect and so insufficient that it undermined his

ability to make an intelligent decision about whether to accept the offer.'" *Morris v. Adm'r New

Jersey State Prison*, 770 F. App'x 601, 605 (3d Cir. 2019) (quoting *Day*, 969 F.2d at 43). In the

context of rejecting a plea, a petitioner must show that "'but for counsel's deficient performance

there is a reasonable probability he and the trial court would have accepted the guilty plea' and

the resulting sentence would have been lower." *Shotts*, 724 F.3d at 376 (citing *Lafler*, 132 S. Ct. at 1391).

The Appellate Division's denial of this claim was not an unreasonable application of clearly established federal law. The Appellate Division noted Petitioner did not clearly assert he would have accepted the plea offer had he been presented with it. This is in line with the relevant law that a petitioner needs to show to a reasonable probability he would have accepted the plea. Petitioner has come forward with nothing in the record before the state court to counter the state court's conclusion that he did not state with any clarity he would have accepted the thirty-year murder plea offer. In analyzing whether the state court's decision runs afoul of § 2254(d), this Court is limited to the record that was before the state court. *See Cullen*, 563 U.S. at 81. Accordingly, for this reason, the state court's denial of this claim was not an unreasonable application of clearly established federal law. Petitioner is not entitled to federal habeas relief on Claim VI.

vii.    *Claim VII*

Petitioner argues in Claim VII he is entitled to federal habeas relief when the trial court failed to instruct the jury as requested by his counsel that the jurors were not to concern themselves about any possible danger Petitioner could pose to the community if they found him not guilty by reason of diminished capacity. During the jury charge conference, Petitioner's counsel argued as follows:

> Your Honor, on page 34 in terms of instructions to the jury to alay their fears that if they find someone not guilty by reason of insanity they're instructed that that does not mean the person is going to be released into the streets and that was added to give some comfort and understanding to the jury because it is so intellectually and emotionally a disconnect and to somehow give them assurance that even though they are finding this person sick, that they're not going to go out and do harm to other people because of their

47

sickness. They say, well, there's a check and the check is the Court, the Court will make a decision when, if someone leaves based on a not guilty by reason of insanity from an institution, I would argue that the same concept should apply in this case for the mental disease or defect since we are arguing and we have said all along that he is antipsychotic. The State psychiatrist, even Doctor Hume to the present time finds him psychotic and we do know if the jury ever found him not guilty either by reason of insanity or by reason of mental disease or defect he's going nowhere. He is absolutely going nowhere because of the treatment he is presently receiving because of the diagnosis of the various doctors over the past three years. And I would request that the same assurance relating to insanity that the jury may have by these word [sic] also be applied with diminished capacity because the concern, even danger is equally present. The very reason we have this language here for insanity is equally applicable to the defense of mental disease or defect in this case because they're identical. My position is not divergent. I am not arguing a different medical position of insanity as I am for mental disease or defect.

(ECF 24-12 at 7). The trial judge rejected this request by Petitioner's counsel noting as follows:

[a]gain, the same basis for denying this request as the previous request to intermingle the legal consequences. They are different and distinct as set forth in the statute created by the Legislature and an effort to explain them the same way by putting and interjecting that language into the charge is not appropriate and I decline to do so.

(*Id.* at 8).

Petitioner then raised this issue on direct appeal. The Appellate Division analyzed this claim as follows:

Defendant also argues that the court erroneously declined to charge the jurors that they were not to concern themselves with any danger that defendant might pose to the community should they find him not guilty due to diminished capacity. Included in the charge was the following:

A verdict of not guilty by reason of insanity does not necessarily mean that the defendant will be freed or that the individual will be indefinitely committed to a mental institution. Under our law if you find the defendant not guilty by reason of

48

insanity, it will then be for the Court to conduct a
further hearing and among other matters, determine
whether or not the defendant's insanity continues to
the present and whether the defendant poses a
danger to the community or himself. The resolution
of those issues will ultimately determine what
appropriate restrictions need to be placed on the
defendant. Thus, procedures exist to adequately
provide for the defendant and to protect the public
in the event the defendant is found not guilty by
reason of insanity.

The court properly declined to give such a charge with regard to
diminished capacity. The insanity charge given by the court is
required under *State v. Krol,* 68 *N.J.* 236 (1975). A successful
insanity defense triggers direct consequences, which include court-
ordered evaluations and institutionalizations and reviews. These
consequences are a part of the criminal justice system, and the jury
should be made aware of them. As we have noted above, a
diminished capacity defense "may negate the mental state that is an
element of the offense charged." *Delibero, supra,* 149 *N.J.* at 92.
The *Delibero* Court explained:

The consequences of a verdict of insanity differ
from one of diminished capacity. A judgment of not
guilty by reason of insanity does not result in a
defendant being set free; rather, the defendant is
subject to further commitment proceedings. A
judgment of not guilty because of the defendant's
diminished capacity does result in a defendant being
set free.

[*Id.* at 104-05 (citations omitted).]

Consequently, there was no reason for the judge to comment on
any danger defendant might or might not pose to the community
by reason of any alleged diminished capacity and certainly no
reason to suggest that such a commitment proceeding would be
instituted against defendant. The judge correctly declined to charge
the jury on some future event that might never occur.

*Nayee*, 2007 WL 1931336, at *8–9.

"[A]n error in the instructions to the jury" may violate due process. *Henderson v. Kibbe*,

431 U.S. 145, 154 (1977). "The question [during habeas review] is whether the ailing instruction

by itself so infected the entire trial that the resulting conviction violate[d] due process." *Id.* (citation and internal quotation marks omitted); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). In that regard, it is also "well established" that the challenged instruction "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973). Moreover, where the alleged error consists of failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. In short, it is the rare case in which "an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Id.* at 154; *accord Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."). Indeed, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71–72. Instead, a habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. For example, due process is violated where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997); *see also Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (noting that due process is violated when "the instruction contained some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

The Appellate Division's denial of this claim was not an unreasonable application of clearly established federal law. The potential consequences for not guilty by reason of insanity and not guilty by reason of diminished capacity are potentially different. Indeed, as noted by the Appellate Division:

> Diminished capacity "describes a disease or defect of mind that may negate the mental state that is an element of the offense charged. The insanity defense exculpates an actor from guilt for conduct that would otherwise be criminal." *Id.* at 92-93. In contrast to insanity, which is an affirmative defense that a defendant must prove by a preponderance of the evidence, "diminished capacity refers to evidence that can negate the presence of an essential mental element of the crime ... [a] jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." *Id* . at 98-99; *see also State v. Breakiron,* 108 *N.J.* 591, 600-01 (1987); *State v. Harris,* 141 *N.J.* 525, 555 (1995). In addition, the consequences of a judgment by reason of insanity differ from one of diminished capacity. "A judgment of not guilty by reason of insanity does not result in a defendant being set free; rather, the defendant is subject to further commitment proceedings. A judgment of not guilty because of the defendant's diminished capacity does result in a defendant being set free." *Delibero, supra,* 149 *N.J.* at 105; *see also State v. Humanik,* 199 *N .J.Super.* 283, 299 (App.Div.), *certif. denied,* 101 *N.J.* 266 (1985). Thus, the two concepts are inherently different both in their substance and in their consequences.

*State v. Bachelder*, No. A-2908-05T4, 2007 WL 1146722, at *7 (N.J. Super. Ct. App. Div. Apr. 19, 2007).

This Court sees no fault with the rejection of Petitioner's requested instruction for the reasons given by the state court. Certainly, omitting the requested instruction did not violate Petitioner's due process rights. Accordingly, Claim VII is denied.

    viii.    *Claim VIII*

Claim VIII is somewhat related to Claim IV. In Claim VIII, Petitioner argues he was denied his right to counsel when the trial judge conducted an ex parte interview of juror E.R.. While Petitioner raised issues concerning the circumstances surrounding E.R. in his PCR

proceedings, it does not appear that he raised the issue of the trial judge's ex parte communication with E.R. in the context of a right to counsel claim during his initial PCR proceedings. Indeed, the Appellate Division noted that Petitioner did not raise this claim in its 2014 opinion noting that the judge erred in conducting this interview ex parte. *See Nayee*, 2014 WL 2197863, at *2 n.6. Petitioner though then raised this issue in another PCR petition. In deciding this claim, the Appellate Division found this claim was procedurally barred and/or that it was decided by the Appellate Division in its 2014 decision. (*See* ECF 27-14 at 3).

Neither party truly addresses whether this claim is procedurally defaulted. Furthermore, this Court disagrees with the Appellate Division's characterization of its 2014 opinion that this claim was previously decided on the merits. Indeed, the Appellate Division's footnote in its 2014 opinion did not address whether the error by the trial judge was harmless, only that the trial judge committed error. Notwithstanding these potential procedural roadblocks, this Court will deny this claim on the merits because it is not "colorable."

In *Rushen v. Spain*, 464 U.S. 114, 117-19 (1983), the United States Supreme Court "emphatically disagreed" with the Ninth Circuit's conclusion that an unrecorded ex parte communication between the trial judge and a juror can never be harmless error. More specifically, the Supreme Court noted as follows:

> Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. "At the same time and without detracting from the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered ... and should not unnecessarily infringe on competing interests." *United States v. Morrison,* 449 U.S. 361, 364, 101 S. Ct. 665, 667, 66 L. Ed. 2d 564 (1981); *see also Rogers v. United States,* 422 U.S. 35, 38–40, 95 S. Ct. 2091, 2094–2095, 45 L. Ed. 2d 1 (1975).

In this spirit, we have previously noted that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S. Ct. 940, 946, 71 L. Ed. 2d 78 (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

This is not to say that *ex parte* communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications. When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred. See, *e.g., United States v. Morrison, supra,* 449 U.S., at 365, 101 S. Ct., at 668; *Rogers v. United States, supra,* 422 U.S., at 40, 95 S. Ct., at 2095. Post-trial hearings are adequately tailored to this task. See, *e.g., Smith v. Phillips, supra,* 455 U.S., at 218–219, and n. 8, 102 S.Ct., at 946–947 and n. 8; *Remmer v. United States,* 347 U.S. 227, 230, 74 S. Ct. 450, 451, 98 L. Ed. 2d 654 (1954).

The final decision whether the alleged constitutional error was harmless is one of federal law. *Chapman v. California,* 386 U.S. 18, 20–21, 87 S. Ct. 824, 826, 17 L. Ed. 2d 705 (1967). Nevertheless, the factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. See 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981). The substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts. See *Marshall v. Lonberger,* —— U.S. ——, ——, 103 S. Ct. 843, 850, 74 L. Ed. 2d 646 (1983).

*Rushen*, 464 U.S. at 117–20; *see also United States v. Riley*, 336 F. App'x 269, 271-72 (3d Cir. 2009) (applying harmless error analysis to trial judge's communication with jury).

This case is even one stepped removed from what was discussed in *Rushen* in that the trial judge's communication with E.R., while ex parte, was *recorded*. Counsel for both sides were read back the trial judge's discussion with the E.R. regarding E.R.'s phone conversation with someone about the trial. Ultimately, the trial judge removed E.R. from the jury for cause. Based on this record, any purported error by the trial judge in initially communicating with E.R. ex parte was harmless error as it did not have a substantial or injurious effect on the outcome of the case based on these circumstances. Accordingly, Claim VIII is denied.

ix.    *Claim IX*

In Claim IX, Petitioner argues PCR, trial and appellate counsel were ineffective in failing to raise the arguments he makes in Claim VIII related to the error of the trial judge in conducting an ex parte interview with E.R. Petitioner raised these claims in his second PCR petition. The Appellate Division determined these claims were procedurally defaulted. Once again, the party's do not explicitly address the potential procedural default of this claim. However, this Court denies this claim on the merits because it is not "colorable."

First, Petitioner's claim that PCR counsel was ineffective does not entitle him to federal habeas relief. Indeed, 28 U.S.C. § 2254(i) precludes claims for ineffective assistance of PCR counsel. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) (while ineffective assistance on initial collateral review proceedings may be grounds for excusing procedural default, it is not the basis for an independent constitutional claim). Next, this Court finds Petitioner has failed to show he was prejudiced by trial and appellate counsel's failure to object to the trial court's ex parte interview of E.R. The interview was transcribed and read back to counsel. After

communicating with counsel, the trial judge immediately removed E.R. for cause. Given these circumstances, this Court fails to see how raising an objection to the trial judge's ex parte interview would have changed the outcome of the proceedings to a reasonable probability, particularly given the harmlessness of the trial judge's error as previously described. Accordingly, Claim IX is denied.

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, this Court finds that a certificate of appealability is only appropriate on Claims I and III and shall not issue on the remaining claims.

## VI.   CONCLUSION

For the foregoing reasons, Petitioner's amended habeas petition is denied. An appropriate order will be entered.


DATED:  April 23, 2021


s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.